[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
Memorandum Filed July 23, 1997
The plaintiff, Attorney Walter A. Twachtman, Jr., has brought this action to foreclose a mortgage given to him by the defendant, Frank L. Hastings, on September 22, 1989, and recorded on January 3, 1990, to secure the sum of $24,895.25, which is the amount claimed by the plaintiff to be the balance due for the professional services that he rendered during the period of his representation of the defendant in various legal matters from 1986 to 1990. The plaintiff was first retained by the defendant in January, 1986 to represent him in legal proceedings to enforce a judgment in favor of Hastings in a prior lawsuit involving an option agreement under which he was to purchase a parcel of land in the town of Coventry, that resulted in a second trial court judgment in his favor which was affirmed by the Supreme Court; see Natural Harmony, Inc. v. Normand, 211 Conn. 145, 146 n. 1 (1989); and the plaintiff represented the defendant in a number of other unrelated matters after he was originally retained.
The underlying facts that are substantially undisputed based upon the testimony of the parties as well as the documents that were admitted into evidence in the course of the trial may be summarized as follows. The initial retainer agreement which was signed on February 5, 1986, provided that the plaintiff would take whatever steps he deemed necessary to clarify and enforce the judgment that had been entered by the court (Hale, J.) on June 27, 1985, in favor of Hastings against Arthur J. Normand, the owner of the Coventry property, and that Hastings would be billed for those legal services at an hourly rate of $95 on a monthly basis.
Twachtman knew at that time that Hastings was unemployed and would not be able to pay the legal fees on a regular basis, but CT Page 7499 both parties believed that the matter would be resolved quickly because the favorable result in the first trial had not been appealed and they did not anticipate that if they were successful in clarifying and enforcing the first judgment that an appeal would be taken. It was also understood by the parties that full payment of the plaintiff's accrued legal fees would be made upon the successful completion of the legal proceedings because the one-hundred-acre parcel owned by Normand contained sand and gravel deposits valued at 2.5 million dollars and also had additional potential value for residential development after the sand and gravel had been removed.
After post judgment procedures to enforce the judgment proved unsuccessful, the plaintiff commenced a second lawsuit on behalf of Hastings and his corporation, Natural Harmony, Inc., in November of 1986, seeking specific performance of the option agreement as well as other relief, which was tried to the court (Stengel, J.) in September of 1987. The court's memorandum of decision was filed on December 10, 1987, in which it concluded that Normand had violated the option agreement by intentionally and unjustifiably thwarting the proposed closing and a judgment for specific performance was entered in favor of Hastings ordering Normand to convey the real estate to Hastings at a purchase price that the court calculated to be $61,701.50. SeeNatural Harmony, Inc. v. Normand, supra, 211 Conn. 146 n. 1, 147.
Normand appealed the decision, and the plaintiff represented Hastings on the appeal and orally argued the case on January 11, 1989. On May 9, 1989, the Supreme Court affirmed the decision ordering the transfer of the real estate at the purchase price specified by the trial court.
During the period of his representation of Hastings in the Normand litigation as well as in other legal matters from January of 1986 until December of 1989, Hastings never complained to him about any aspect of the fees for which he was regularly being billed or about the way in which he was handling the various legal matters for which he had been retained. Twachtman characterized their relationship during that period of time as "extremely cordial" and felt that Hastings was satisfied with the quality of his professional services and skills because he had retained him in a number of important and complex matters including a class action brought against the water pollution control authority of the town of Coventry challenging the constitutionality of its sewer assessment procedures. CT Page 7500
On October 6, 1988, the parties entered into a letter agreement concerning the sum of $48,188.69 which was being held in the plaintiff's clients funds account and was the net amount remaining from the condemnation of the defendant's property on Babcock Hill Road in Coventry by the department of transportation which the plaintiff had negotiated with the state. The agreement stated that the total of unpaid legal fees for the plaintiff's services rendered and billed though the end of July 1988 was $32,644.52, which included the sum of $24,644.00 for the plaintiff's services in the Normand case at the trial level and in the pending appeal and that the plaintiff had advised Hastings that he "was entitled to an attorney's lien [for the total amount due] against the funds in my possession and collected on your behalf."
The agreement stated that the parties had agreed to a compromise whereby $15,000 would be paid from the balance of the condemnation proceeds to the plaintiff and that the balance of $32,688.69 would be paid to the defendant. The balance due for unpaid fees of $17,644.52 was to be secured by a note and mortgage in that amount with interest at 8 percent and provided that no demand for payment would be made until the completion of the appeal in the case of Natural Harmony, Inc. v. Normand.
The letter stated that Hastings could discharge the plaintiff as his attorney at any time, but that if he was discharged without cause, he would be entitled to demand payment of all his legal fees including the amount secured by the note and mortgage. Hastings signed the proposed agreement which included a statement that he had read it and understood and accepted its terms and acknowledged that he had received a clients funds check from the plaintiff for $32,688.69 pursuant to the agreement.
After the Supreme Court's decision in his favor on May 9, 1989, Hastings found it extremely difficult to obtain any financing for the purchase of the Normand property despite its potential value because banks were not lending money on land at that time and his personal financial situation was such that he was unable to convince a lending institution that he was a creditworthy borrower. It was not until September of 1989 that he was able to obtain approval for a loan from the Brooklyn Savings Bank in the amount of only $100,000, and he had to accept that commitment so that he could finally proceed with the purchase of the property. CT Page 7501
At that time, the balance due on Hastings' account based on Twachtman's billings was $34,895.25, and another letter agreement was entered into by the parties on September 9, 1989, based on the assurances given by Hastings, according to the plaintiff's testimony, that he would be able to secure secondary financing within a very short time after the closing because the property would then be in his name. After listing the amounts due on each file, and noting that interest in the amount of $1,411.57 was due on the outstanding note, the letter stated that because Hastings had told Twachtman that the proceeds of the bank loan were not sufficient to meet the condition of the prior note that the entire balance would be due and payable at the conclusion of the Normand case, and in order to permit Hastings "to acquire the property so long pursued", a payment of $10,000 would be made on account, and the remaining balance of $24,895.25 would be secured by a note and mortgage at 15 percent interest which was to be paid on or before December 31, 1989.
The note was to provide for a payment of $5,000 upon the closing of any of the lots and it was to be secured by a second mortgage which was not to be recorded unless Hastings defaulted in his obligations under the agreement. The language in the earlier agreement was also restated to the effect that the defendant was free to discharge him at any time, but that if he was discharged without cause the plaintiff could demand payment for the full balance due, and also stated that it superseded "all prior agreements made between us concerning legal fees."
The defendant signed the letter stating that he understood and accepted its terms and the plaintiff stated that he had no reason to believe at that time that Hastings' consent was not given voluntarily and understandingly. Moreover, he testified that in the two weeks that intervened between the signing of the agreement and the closing held on September 22, 1989, Hastings could have used any other attorney to represent him because it was a routine bank mortgage closing and he did not exert any pressure upon him to utilize his services for that purpose.
On December 6, 1989, Hastings wrote a letter to Twachtman in which he expressed, apparently for the first time since their professional relationship began in 1986, his dissatisfaction with the quality of his services and the amount of his fees, stating that "[a]fter spending several hours going over the bills, the unnecessary charges and the history of our relationship. I am CT Page 7502 convinced that the approximate amount of $40,000 I have paid you to date is in excess of what you earned or I owed you." The plaintiff responded by letter dated December 29, 1989, stating that his belated expression of his dissatisfaction with his services was "simply an effort to avoid paying a justifiable legal bill" and that since he had clearly indicated that he had no intention of paying the balance due, he gave him notice that he would file the mortgage on the land records within ten days in accordance with the provisions of the agreement of September 9, 1989.
He also suggested to him in the same letter that the disputed fees be submitted to arbitration under the procedures provided for the resolution of such disputes by the Connecticut bar association. but despite his subsequent attempts to persuade Hastings through his newly retained attorneys to utilize those procedures or any other form of alternate dispute resolution more to his liking, the defendant nevertheless refused to do so. He also advised him that since they were now in an adversarial position, he could no longer represent him in the only remaining active file, Cyr v. Coventry, the class action that had been brought against the town challenging the validity of its sewer assessments, and that he would have to find another lawyer to represent the class, subject to the court's approval, for the purpose of appealing the adverse decision of the trial court.
In a letter dated February 6, 1990, Hastings nevertheless proposed that the plaintiff handle the Cyr appeal if he was "interested" in doing so, and proposed a separate retainer agreement for that purpose for a fee of not more than $6,000 to be secured by a mortgage on two of the lots, and his proposal was accepted with certain modifications which were made by the plaintiff in order to further secure the payment of the agreed fee. The requested mortgage documents were signed by Hastings, and Twachtman proceeded to prosecute the appeal to its conclusion on November 13, 1990, when the trial court's judgment was affirmed by the Supreme Court. See Cyr v. Coventry, 216 Conn. 436
(1990).
The plaintiff commenced this action to foreclose the mortgage in January, 1995, and thereafter, on August 12, 1996, the defendant filed a grievance against him that was considered by a local grievance panel and by a reviewing committee of the statewide grievance committee which found no misconduct on the part of the respondent that warranted disciplinary action and CT Page 7503 dismissed the complaint on January 17, 1997. The reason stated for its action was that it could not conclude that Twachtman's conduct in representing Hastings was inconsistent with ethical standards but noted that its dismissal was without prejudice to the complainant's right to refile it "should the findings of the trial court in which the dispute between the Complainant and the Respondent is currently pending evidence misconduct on the part of the Respondent."
The defendant argues that under the facts and circumstances of this case, the court should exercise its discretion based upon equitable considerations and principles to withhold foreclosure or, in the alternative, to reduce the amount of the stated indebtedness. See Hamm v. Taylor, 180 Conn. 491, 497 (1980). More specifically stated, his claim is that the mortgage transaction to secure the payment of fees which is the subject of this action, cannot withstand the close scrutiny that the court must give it in order to determine whether undue influence was exerted or advantage taken of the fiduciary relationship between the parties to obtain an unconscionable advantage; DiFrancesco v.Goldman, 127 Conn. 387, 392-93 (1940); and that undue influence exerted upon a client to secure the recovery of attorney fees by means of a mortgage, although not constituting actual duress may be sufficient to invalidate the instrument. See McKnight v.Gizze, 107 Conn. 229, 235 (1928).
The defendant also argues that the earlier agreement of October 6, 1988, which was reached after the plaintiff had asserted his right to a charging lien on the proceeds of the condemnation settlement for the full amount of his unpaid fees, was "improperly obtained" (Defendant's Brief. p. 10, n. 8), and that the mortgage transaction to secure the balance of his fees in lieu of enforcing that lien by taking a mortgage on property which was the subject of the Normand litigation, was in violation of Connecticut Rules of Professional Conduct 1.5(b), 1.8(a), and 1.8(j). The court will consider these claims based upon the most recent Connecticut case law concerning the exercise of an attorney's common law charging lien, as well as upon the ethical considerations involved under our Rules of Professional Conduct where an attorney takes a note and mortgage deed from a client to secure the payment of his fees, and the security interest is taken in property that is the subject of the litigation.
The precipitating factor for the first agreement was the plaintiff's claimed entitlement to a charging lien on the CT Page 7504 proceeds of the highway condemnation case based on an Appellate Court decision, Perlmutter v. Johnson, 6 Conn. App. 292 (1986), that reaffirmed the holding in Cooke v. Thresher, 51 Conn. 105,107 (1883), that an attorney has "an equitable lien upon the avails [of his actions for a client] for the services and expenses in the suit." The Supreme Court in Cooke v. Thresher
also stated that the attorney's lien extends not only to the services and expenses of the particular suit which generated that fund, but also "for previous services in other matters." (Emphasis added.) Id.
In a recent opinion of this court (Hodgson, J.) which was published after the briefs of the parties had been filed in this case, it was held that the Supreme Court's decision in Cooke v.Thresher, supra, continues in all respects to be a correct statement of our law concerning the validity and the extent of attorneys' charging liens, and that the same principles stated therein apply to settlements as well as judgments that have been created by the efforts of attorneys on behalf of their clients.McNamara Goodman v. Pink, 44 Conn. Sup. 592, 601, 18 CONN. L. RPTR. 660 (1997). Moreover, Judge Hodgson concluded, as does this court, that the Supreme Court, in Marsh, Day Calhoun v. Solomon, 204 Conn. 639 (1987), approved, "albeit in the context of retaining rather than charging liens, the principle that an attorney who has worked on a matter shall be favored with regard to the asset he or she has worked to create," and that the Supreme Court would continue to recognize the existence of a common law charging lien against a recovery secured by the attorney's efforts. Id. 601-602.
It is generally recognized that under Connecticut law the scope and extent of its common law charging lien is not limited to the services rendered by the attorney in the particular action that produced the fund against which the lien is claimed, but also includes, based on the holding in Cooke v. Thresher, the full balance due for all previously rendered services as well. 7 Am.Jur.2d, Attorneys at Law § 328; see also annot., 23 A.L.R. 4th 336 (1983). Where a charging lien is asserted and negotiated between the parties, and results in a letter agreement drafted by the attorney and admittedly signed by the client, which is unambiguous and is not disputed at the time, it will be deemed to be a substituted agreement which supersedes any prior arrangements which may have been made at the time the attorney was originally retained. See Kenney v. Vandiver, 414 So.2d 237,239 (Fla.App. 1982). CT Page 7505
The defendant argues that even if the plaintiff's demand for payment of the full amount of his fees was a proper exercise of his right to an attorney's charging lien under our law, and that his waiver of that right in exchange for a substantial part payment by Hastings was a fairly negotiated compromise, the fact that the balance of the amount claimed was to be secured by a mortgage on the Normand property constituted a violation of Rule of Professional Conduct 1.8(j) which prohibits a lawyer from acquiring "a proprietary interest in the . . . subject matter of litigation the lawyer is conducting for a client . . ." The defendant relies on an opinion of the statewide grievance committee that Rule 1.8(j) was violated when an attorney for the husband in a marital dissolution action acquired a consensual security interest just before the trial in order to protect his fees by means of a recorded mortgage of his client's interest in certain real estate that was to be the subject matter of the court's orders concerning the distribution of the marital property. In re Kiefer, Statewide Grievance Committee Opinion 86-0673 (1988).
A grievance committee opinion is purely advisory and is not binding on the court; Marsh, Day Calhoun v. Solomon, supra,204 Conn. 646-47 n. 4; but it should be noted that the committee on professional ethics of the Connecticut bar association recently stated in an informal opinion issued on March 4, 1997, that it disagreed with the Kiefer opinion because it did not follow the holdings of recent cases that a lien taken to secure a fee is a conditional interest in property rather than a "proprietary interest" within the meaning of Rule 1.8(j). Informal Opinion 97-4, Taking a Security Interest in Client Property to Protect Fees (1997). In the principal case that it relied upon, Skarecky Horenstein v. 3605 N. 36th St., 825 P.2d 949 (Ariz.App. 1991), the Arizona Court of Appeals held that the creation of a security interest in specified collateral did not violate 1.8(j) "because the [plaintiff law] firm's only intent was to acquire security for the payment of its fees, not to obtain an ownership interest in the lawsuit", and that in any event it came within the first of the two express exceptions to that rule which provides that a lawyer may "[a]cquire a lien granted by law to secure the lawyer's fees or expenses . . .". Rule 1.8(j)(1); Id. 951.
The second of the two exceptions to Rule 1.8(j) permits a lawyer to contract with a client for a contingent fee in a civil case, and the important public policy served by both exceptions is that they provide greater access to legal services for those CT Page 7506 who do not have liquid assets to pay for them and who can only do so by providing the attorney with a security interest in the subject matter of the litigation the lawyer is conducting for the client, or by entering into a contingency agreement with the attorney. Id. 953; Informal Opinion 97-4, supra. A lawyer should be permitted to obtain a lien to secure the payment of his fee rather than to have to resort to other protective measures that may impact negatively on his representation of the client or on their relationship, because by offering the lawyer the reasonable assurance of collecting his fee, such liens "may actually eliminate a potential source of friction between client and lawyer." Hazard Hodes, The Law of Lawyering, 2d Ed. 286 (1993).
For the foregoing reasons, the court finds that the letter agreement of October 6, 1988, and the mortgage documents executed pursuant to its terms, did not constitute a violation of Connecticut Rule of Professional Conduct 1.8(j), because the plaintiff's intention was merely to acquire security for the payment of his fees after the Normand litigation had been concluded, and the mortgage, which was not to be enforced until that time, was a permissible security interest based upon recognized legal and ethical standards for the creation of such interests for the purpose of securing the payment by the client of fees due the attorney. Although an attorney's action in claiming a lien for the payment of past due legal fees is one necessarily taken to protect his own interest, the assertion by an attorney of his own legal right to payment cannot in itself be the basis for a claim of a breach of fiduciary duty by the client against the attorney. See Morfeld v. Andrews, 579 P.2d 426, 433
(Wyo. 1978); see also Burk v. Burzynski, 672 P.2d 419, 424 (Wyo. 1983).
The court's finding that the mortgage given by the defendant on October 6, 1988, based on the facts and circumstances surrounding its execution, did not constitute a breach of the plaintiff's fiduciary obligations to his client in either the legal or ethical sense is not dispositive of the issue of whether the agreement of September 9, 1989, was fairly negotiated as claimed by the plaintiff, or was the product of undue influence or duress and therefore a breach of his fiduciary obligations, as claimed by the defendant. The governing rule is that an attorney has the right to contract with his client as to the value of his services while the relationship exists, and although any such agreement will be closely scrutinized by the court, it will be sustained if it is found that no undue advantage of the client CT Page 7507 was taken to obtain it, and that it was entered into by the client freely and with a full understanding of his rights.DiFrancesco v. Goldman, supra, 127 Conn. 393 (1940).
Nevertheless, under such circumstances, a rebuttable presumption of undue influence arises because the drafting of an agreement concerning fees, like the drafting of a will for a client, "presents an opportunity and a temptation, which, together with the personal friendship and confidence and influence of the relation, justify suspicion and the requirement from the [attorney] of satisfactory evidence that the opportunity was not embraced and the influence was not exerted." St. Leger'sAppeal, 34 Conn. 434 at 451 (1867). More specifically, the committee on professional ethics of the Connecticut bar association has stated in its recent informal opinion, supra, Informal Opinion 97-4, that "[a] lawyer taking a note together with a security interest in client property is required to comply with the fairness and disclosure standards of Rule [of Professional Conduct] 1.8(a)(1), (2) and (3) [and the] transaction should be `characterized by the utmost fairness and good faith . . .'" (quoting McKnight v. Gizze, supra,107 Conn. 235).
Rule of Professional Conduct 1.8(a)(1), (2) and (3) reads as follows:
 (a) A lawyer shall not enter into a business transaction with a client or former client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client or former client unless:
 (1) The transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client or former client and are fully disclosed and transmitted in writing to the client or former client in a manner which can be reasonably understood by the client or former client;
 (2) The client or former client is advised in writing that the client or former client should consider seeking the advice of independent counsel in the transaction and is given a reasonable opportunity to do so;
(3) The client or former client consents in writing CT Page 7508 thereto;
The claimed factual basis for the principal defense to this action is that the defendant's consent to the mortgage transaction and to its terms as required under subsection (3) of the rule was a nullity because, as Hastings testified, he signed the letter agreement of September 7, 1989, and the mortgage documents at the closing on September 22, 1989, because he believed that he had to do so in order to acquire the Normand property, and he was concerned that if he did not, that Twachtman might foreclose and he would lose the bank's mortgage commitment, and that he therefore did not intend to treat the agreement as binding because it was compelled and coerced under the circumstances that surrounded its making.
Although Hastings also testified that the circumstances under which the earlier agreement was signed were equally coercive, there had been a fundamental change in the relationship of the parties after May 9, 1989, because the litigation that was the basis for the original retainer agreement in February, 1986, had been finally concluded, and on September 9, 1989, the plaintiff had no existing contractual or ethical obligation to perform legal services for the defendant in any pending matter other than the Cyr assessment appeal which later became the subject of a separate and unrelated agreement at the defendant's request, and upon the plaintiff's terms. See Marcus v. Duperry, 223 Conn. 484,488-89 (1992). Under those circumstances the negotiation of a modified or substituted agreement to secure the payment of the plaintiff's fees for services previously rendered could no longer adversely affect the performance of the attorney's professional responsibilities or govern the course of action pursued by the attorney in the representation of his client. Id.; Cf. Committeeon Professional Ethics and Conduct v. McCullough, 468 N.W.2d 458,461 (Iowa. 1991).
Where a party insists upon a contractual provision or a payment which he honestly believes he is entitled to receive, certainly unless that belief is without any reasonable basis, his conduct is not wrongful and does not constitute duress or coercion under Connecticut law. Weiner v. Minor, 124 Conn. 92, 95
(1938); Zebedeo v. Martin E. Segal Co., 582 F. Sup. 1394, 1417
(D.Conn. 1984). Even in those jurisdictions that have expanded the stricter common law definition of duress to include economic or financial compulsion, it is not sufficient to show that consent was secured by the pressure of financial circumstances, CT Page 7509 or by the fact that one party insisted upon a legal right and the other party yielded to that insistence, and actionable economic duress will not be found to have been proved unless there was no reasonable alternative to the terms presented by the party whose conduct is claimed to have been coercive. 25 Am.Jur.2d, Duress and Undue Influence § 7.
There was no evidence presented in the course of the trial to contradict the plaintiff's testimony, which the court finds to be credible and reasonable, that Hastings could have used an attorney of his own choosing to represent him at the closing, which Twachtman described as a "routine bank mortgage closing," nor was there any evidence that the plaintiff had any special information or knowledge that he had acquired in the course of his representation that would have been needed for the purpose of closing the bank mortgage, or that Twachtman influenced him in any other way to use his services rather than those of another lawyer. Moreover, when the defendant was presented with the proposed agreement on September 9, 1989, the most obvious alternative available to him under the circumstances would have been to ask for time to look it over, and then to get an opinion from another attorney so that he could have the benefit of independent legal advice before he signed it. Cf. Eulrich v.Snap-On Tools Corp., 853 P.2d 1350, 1356 (Or.App. 1993).
The mere fact that a person enters into an agreement as a result of the pressure of business circumstances, financial embarrassment, or economic necessity, cannot be the sole basis for a claim of business compulsion or economic duress, nor can such a claim be predicated on a demand which is lawful or upon the assertion of a legal right, in the absence of a wrongful act by the party against whom the claim is made that takes undue or unfair advantage of the situation to coerce him into making the agreement. Chouinard v. Chouinard, 568 F.2d 430, 434 (5th Cir. 1978). "There is of course an element of compulsion anytime a creditor asks a debtor in default to agree to anything," but such a request is not wrongful merely because a creditor exercises his right to declare a default or to forbear from taking such action only upon the debtor's agreeing to certain modifications in their agreement. Glenfed Financial Corp. v. Penick Corp., 647 A.2d 852,857 (N.J.Super. A.D. 1994).
For the foregoing reasons, the court finds that the agreement of September 7, 1989, was "the result of the free assent of the parties making it"; McCarthy v. Taniska, 84 Conn. 377, 381
CT Page 7510 (1911); based on the common law definition of duress under Connecticut law, because it was not the product of any wrongful conduct on the part of the plaintiff and he honestly and reasonably believed himself to be entitled to the contractual conditions contained therein. Zebedeo v. Martin E. Segal Co.,supra, 582 F. Sup. 1417. Moreover, even if the court were to accept the defendant's testimony as accurately describing his state of mind at the time he signed the agreement, namely, his fears that he would lose the Normand property, or be exposed to a foreclosure action by the plaintiff if he did not do so, the absence of any proof of wrongful conduct by the plaintiff and the availability to the defendant of a reasonable alternative, for the reasons previously stated herein, would preclude him from successfully raising the defense of economic duress or compulsion. Cf. Shanley Fisher, P.C. v. Sisselman,521 A.2d 872, 879 (N.J.Super. A.D. 1987).
The requirement of written consent under subsection (3) of Rule of Professional Conduct 1.8(a) having been satisfied, the fairness and reasonableness of the transaction and the terms and conditions under which the plaintiff continued to hold his previously acquired security interest in the Normand property, must be determined pursuant to subsection (1) of the rule. In this connection, it should be noted that the stated purpose of the agreement of September 7, 1989, was "to permit [Hastings] to acquire the property so long pursued", and that under the substituted agreement the plaintiff waived his right to declare the prior note in default under its terms and to record the mortgage documents, in exchange for the payment by the defendant of a substantially smaller percentage of the remaining balance claimed to be due than had been paid under the first agreement, and with further payments to be made only upon the sale of the lots.
The proposal made by Hastings in his letter of February 6, 1990, in order to induce Twachtman to resume his representation of Hastings and other members of the plaintiff class in the Coventry sewer assessment appeal, is clearly inconsistent with the defendant's claims in this case in two respects, the first of which goes to the weight that should be given to his earlier letters written in December of 1989, that questioned the reasonableness of the plaintiff's attorney fees for the first time, and also claimed that he had overvalued his services in theCyr case as well as in other matters that he had handled, and that, as he stated in the second of the two letters, he would not CT Page 7511 send him "another dime" for services that he had rendered in any of those cases. It is also particularly relevant to the question of the fairness and reasonableness of the terms and conditions of the mortgage agreement because Hastings himself proposed that payment of the agreed fee of $6,000 be secured by mortgages on two of the lots that he had acquired from Normand which was also an essential condition of the mortgage that he now challenges in this action as being unreasonable and inequitable.
The conduct of a litigant with respect to the matter in dispute, `whether by acts, speech or writing, which is clearly inconsistent with the truth of his contention, is a fact relevant to the issue.' Connecticut Union of Telephone Workers v. SouthernNew England Telephone Co., 148 Conn. 192, 202 (1961). The inconsistency between the offer initiated by Hastings to reinstate Twachtman as his attorney for the appeal in Cyr v.Coventry and the earlier correspondence questioning the reasonableness of his fee and the caliber of his services was never satisfactorily explained by the defendant in the course of his testimony, and apart from the unfavorable inference that could reasonably be drawn as to the validity and genuineness of the defendant's complaints as to those matters, it can be construed at the very least, as an acknowledgment on his part that the only practicable and reasonable way for the plaintiff to secure the payment of his fees without substantially impairing the defendant's ability to reap the economic benefits of the property "so long pursued", was by means of a mortgage on the property that had been the subject of the litigation.
For the foregoing reasons, the court finds that pursuant to Rule of Professional Conduct 1.8(a)(1), the letter agreement of September 7, 1989, and the mortgage deed and note executed in favor of the plaintiff on September 22, 1989, pursuant to that agreement, constituted a permissible security interest because the transaction and the terms under which Twachtman acquired it were fair and reasonable to the defendant and were fully disclosed and transmitted in writing to him in a manner which could be reasonably understood by him.
The defendant makes the further claim that despite the fact that the plaintiff testified that he advised him orally of the advisability of seeking the advice of independent counsel, the letter agreement makes no reference to the fact that such advice was in fact given as required under subsection (2) of Rule 1.8(a). The defendant's argument that the requirement of written CT Page 7512 advisement concerning independent legal advice must invariably be given regardless of the factual circumstances, is inconsistent with the Connecticut cases that hold that the presumption of undue influence arising out of the relationship of attorney and client is a presumption of fact, and where the trier of fact finds that there is no evidence of unfairness or of unconscionability, there is no indispensable requirement that the client actually receive such advice from another attorney or that he be instructed by his attorney that such an alternative is available to him. St. Leger's Appeal, supra, 450-51; Matter ofAutoworld Enterprises, 131 B.R. 1 (D.Conn. 1991).
The defendant's final claim is that the plaintiff was guilty of an additional ethical violation in that the 15 percent interest rate stated in the mortgage note was in fact an interest charge on an outstanding balance for legal fees because Rule of Professional Conduct 1.5(b) has been construed by the committee on professional ethics of the Connecticut bar association as prohibiting an attorney from charging interest on outstanding accounts receivable from a client unless such interest charges have been agreed to in advance of the performance of the attorney's services as part of the initial retainer agreement. Informal Opinions 82-10 and 90-25. He also argues that although that rate may not appear excessive as compared to the 13.25 percent rate charged by the Brooklyn Savings Bank under its first mortgage, "the measure of the appropriate rate [of] interest in an agreement between a fiduciary and his client should [not] be the same as that rate charged by other parties with no prior relationship, duty, or obligation to the defendant." Defendant's Brief, p. 14.
The principal reason for the relaxation of the ethical restrictions on attorneys from acquiring a security interest in the cause of action or in the res sought to be recovered in the litigation was that "[a] general prohibition against taking such security could place the lawyer at a substantial disadvantage to other creditors of the client . . ."; Committee on ProfessionalEthics v. McCullough, supra, 468 N.W.2d 458, 461 n. 3; but lawyers, unlike commercial creditors, remain subject to the ethical safeguards provided under Rule of Professional Conduct 1.8(a) for the protection of the client, namely, that the terms are fair and reasonable and are fully disclosed, that he has an opportunity to consult with independent counsel, and that he has given his written consent. It could not have been the intention of those who drafted the Rules of Professional Conduct to give CT Page 7513 attorneys access to the same remedies for the recovery of their fees as any other unpaid creditor, and at the same time to prohibit them from charging interest on their overdue accounts or from recovering prejudgment interest under General Statutes §37-3a for the detention of money after it becomes payable. SeeSomers v. Krupa, 147 Conn. 225, 228 (1960).
The underlying reasons for the terms of the mortgage note, including the interest rate of 15 percent, which the defendant claims is excessive and unreasonable, and the short three-month maturity date, were fully explained by the plaintiff in his testimony and are substantially undisputed. The court accepts Twachtman's testimony that after he received the bank's mortgage commitment, Hastings assured him that he would obtain secondary financing from private sources, if necessary, after the closing on the Normand property, and because the plaintiff was not a commercial lender and had to have full payment as soon as possible, rather than interest income on his client's indebtedness, he agreed to accept the $10,000 payment and fixed the interest rate at 15 percent so as to induce Hastings to get the necessary financing as soon as possible and he set the maturity date as December 31, 1989, because Hastings had told him that was all the time he needed to obtain the secondary financing.
For the foregoing reasons, the court finds that the provision for interest in the mortgage note did not constitute an ethical violation as claimed by the defendant, and that the rate of interest was not excessive or unreasonable, nor was the term of the note unreasonably short, based upon the credible evidence concerning the factual circumstances under which the letter agreement was signed on September 9, 1989.
Accordingly, the court finds the issues for the plaintiff on the complaint against the defendant and also finds the issues in favor of the plaintiff against the defendant on all of the defendant's special defenses.
The plaintiff is therefore entitled to enforce the note and mortgage dated September 22, 1989, and may proceed to claim the case for judgment on its complaint for foreclosure.
HAMMER, J.T.R. CT Page 7514