******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# APPENDIX

## ANGELO TEDESCO, TRUSTEE
### *v.* RESJIMI AGOLLI ET AL.*

Superior Court, Complex Litigation Docket at Waterbury

File No. CV-12-6016130-S

Memorandum filed June 21, 2016

*Proceedings*

Action to foreclose a mortgage on certain real property owned by named defendant et al. *Judgment for plaintiff as to liability.*

*Jeremy S. Donnelly*, for the substitute plaintiff Scott Tedesco, trustee of the Heritage Builders of Waterbury, LLC, 401 (k) Profit Sharing Plan.

*Justin J. Garcia*, for the named defendant et al.

*Opinion*

DOOLEY, J.

## PRELIMINARY STATEMENT

This is an action to foreclose a mortgage covering several parcels of real property located in Waterbury, Connecticut, each of which is owned by the defendant Fikri Development, LLC (Fikri). The properties at issue are: (1) 3743 East Main Street; (2) 3496 East Main Street; (3) 51 Matteson Road; and (4) 3514 Main Street. The defendant Resjimi Agolli (Agolli) is currently the sole member of Fikri. The defendants assert several special defenses to the foreclosure action. Trial was conducted over the course of three days in May, 2016. The court heard testimony from seven witnesses and admitted numerous documents into evidence. Simultaneous trial briefs were submitted on June 1, 2016. The court has considered the testimony and evidence introduced, the arguments set forth in the parties' memoranda, the authorities cited therein, and renders this decision based thereupon. For the reasons set forth below, judgment will enter in favor of the plaintiff as to liability.

## FACTUAL FINDINGS

"In a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . It is within the province of the trial court, as the fact finder, to weigh the evidence presented and determine the credibility and effect to be given the evidence." (Citation omitted; internal quotation marks omitted.) *Cadle Co.* v. *D'Addario*, 268 Conn. 441, 462, 844 A.2d 836 (2004). The court makes the following factual findings by a fair preponderance of the evidence, unless otherwise indicated, based upon the better, more credible evidence presented.[1]

Agolli came to the United States in 1967 from what is now Macedonia as a young woman newly married to Fikri Agolli. She and her husband settled in the Waterbury area where they raised three children. Eventually, Agolli's husband owned and operated a diner in Waterbury, at which Agolli sometimes worked. As the children grew, they helped in the diner as well. Ultimately, each of the children pursued careers of their own. In 2006, Agolli's husband was diagnosed with cancer, an illness to which he would eventually succumb. Agolli could not run the diner on her own and so arranged to sell it. At the time, there was an interested buyer for the diner but his interest was contingent upon a zoning change being made. The buyer paid Agolli $7500 per month as consideration for not selling the diner to someone else. Ultimately, the putative purchaser did not obtain the zone change and terminated the option to purchase. Thereafter, Agolli located a buyer and sold the diner for $375,000.

During his life, Agolli's husband had purchased numerous parcels of undeveloped property in the Waterbury area. After his passing, Agolli became the owner of these parcels.

Joseph Antonios was a local mortgage broker who ran his own business, Metro Mortgage. He also owned and operated The Private Mortgage Fund, LLC (The PMF), which financed mortgage loans. Fesnik Agolli (Nik), Agolli's son, worked for Antonios' mortgage brokerage business for approximately fourteen years. He is presently a police officer for the city of Waterbury. During the time that Nik Agolli worked for Metro Mortgage, Antonios became well known to and a friend of the Agolli family. He would often accompany Nik Agolli to Agolli's home for dinner. The Agollis liked and trusted Antonios. In 2007, Antonios began discussions with Agolli about developing her properties so that they would generate cash flow for Agolli.[2] Fikri was formed and Agolli transferred all of her real estate holdings into Fikri, to include her personal residence. Agolli was a 50 percent member; Antonios' wife, Gina, was a 50 percent member; and Antonios was made the manager.[3] The arrangement called for Antonios, as the manager, to develop the properties. The operating agreement gave Antonios broad and largely unfettered authority to act on behalf of Fikri.

Between 2008 and 2010, Antonios borrowed hundreds of thousands of dollars on behalf of Fikri, securing these loans with the properties Agolli had transferred into Fikri. Some of these loans were financed by the Angelo P. Tedesco Money Purchase Pension Plan (ATMPPP). Angelo Tedesco was a local property developer. He had a business relationship with Antonios, and would, at times, provide the funds through which The PMF extended loans. In 2008, Antonios arranged for The PMF to loan Fikri $750,000. This debt was secured by a mortgage on the four properties at issue here, as well as Agolli's personal residence located at 375 Maybrook Road, Waterbury, Connecticut, and an undeveloped parcel of land located on Austen Road in Waterbury, Connecticut. In 2010, Tedesco, as Trustee of the ATMPPP, agreed to take an assignment of this note and mortgage. In connection therewith, Agolli, on behalf of Fikri, signed a Note and Mortgage Modification Agreement, to include a new Promissory Note dated January 12, 2010 (exhibit B). This transaction closed on or about January 12, 2010. The Promissory Note contained a 10 percent interest rate and a payment schedule of interest only for twelve months with the principal due in full on January 12, 2011.

No discernible progress was made in the development of the properties. As a result, the properties did not generate any cash flow with which to service the enormous debt which had been taken on by Fikri.[4] Fikri defaulted under the terms of the January, 2010 Note.

By service of a writ of summons and complaint filed September 3, 2010, Angelo Tedesco as Trustee of the ATMPPP commenced a foreclosure action against Agolli and Fikri.[5] Fikri and Agolli were represented by Attorney Timothy Sullivan of Mahaney, Geghan & Sullivan. Attorney Sullivan was a childhood friend of Nik Agolli and had known the Agolli family for many years. Nik Agolli asked Attorney Sullivan to defend the foreclosure with the primary objective being the securing and safeguarding of Agolli's personal residence on Maybrook Road in Waterbury, Connecticut.

Although it is not clear precisely when the relationship between Agolli and Antonios soured, following the filing of the foreclosure action, the determination was made to remove both Joseph and Gina Antonios from any further involvement with Fikri. Also during this time period, Agolli spoke directly with Angelo Tedesco in an effort to resolve the foreclosure and satisfy Fikri's debt to the ATMPPP. She testified that she asked him whether he intended to leave her "out on the street" with nothing. Agolli wanted Tedesco to accept $500,000 from the anticipated sale of one of the parcels of property in full satisfaction of Fikri's debt.

Attorney Sullivan eventually worked out a resolution of the foreclosure action with Tedesco, who was represented by Attorney Paul Margolis. The debt would be refinanced as follows. Fikri would consummate the sale of property located on Austen Road, Waterbury, Connecticut, from which $290,000 would be paid to Tedesco to pay down the outstanding Fikri debt. Fikri would sign a new Promissory Note in the reduced amount of approximately $571,000. The new Note would bear interest at 5 percent, instead of the previous interest rate of 10 percent. The new Note would be secured by the four properties at issue here, but Agolli's personal residence would no longer be on the mortgage, protecting her home in the event of future default. The new Note required no payments for approximately six months, to give Fikri time to either sell or develop the property, in a fashion that would permit Fikri to stay current on its debt obligations.

Attorney Sullivan testified that he had regular communications with Nik Agolli, Suzi (Agolli) Zenko, as well as Agolli herself, regarding the terms of the refinance and settlement of the pending foreclosure. He testified that he sent all draft documents to Suzi because she is an attorney. Although there were a few discussions with Antonios, Attorney Sullivan was aware that Antonios was being removed from Fikri and he took his direction from the Agollis. Consistent with Attorney Sullivan's testimony, Antonios denied that he was the architect of the refinance or that he negotiated its terms on behalf of Fikri.[6] He was being removed from Fikri, so that limited his involvement to participating in the execution of the negotiated agreement as necessary.

However, Nik Agolli and Agolli testified that Attorney Sullivan never discussed the terms of the refinance with them until the morning of the closing. Agolli further testified that she believed Tedesco had accepted her proposal to resolve Fikri's debt by the payment of $500,000 from the proceeds of the Austen Road sale, contingent upon his receipt and review of the purchase and sale contract. She testified that she asked Attorney Sullivan to send the contract to Tedesco and that she believed he had done so. Based upon these discussions, Agolli testified that she believed that the closing which occurred was not a refinance at all, but a resolution of Fikri's debt to Tedesco. She testified that she was "surprised" to learn that she would be asked to sign a new Note or that there would continue to be mortgages on some of her property. Her testimony is not credited. To accept this testimony would be to completely ignore or discredit the testimony of Attorney Sullivan, Antonios, and Attorney Margolis,[7] each of whom had the same understanding of how this refinance came to pass, and whose understanding is entirely consistent with the documents created and signed by Agolli on behalf of Fikri.

On July 26, 2011, the closing on the refinance of the Fikri debt occurred in various stages at Attorney Sullivan's office. Present at various times was Agolli, Nik Agolli, Suzi (Agolli) Zenko, Attorney Sullivan, Attorney Margolis, Joseph Antonios and perhaps others.[8] Fikri sold property located on Austen Road, Waterbury, Connecticut, to a disinterested purchaser. The sale proceeds were used to pay off encumbrances on that property, leaving approximately $290,000 for the paydown of the Tedesco debt.[9] Gina and Joseph Antonios were removed from Fikri. The principals had already agreed that Agolli would become the only member of Fikri owning a 100 percent interest and Antonios would be removed as manager. To accomplish this shift, Antonios was to be given a mortgage in the amount of $88,000 secured by the four properties at issue here, though his mortgage was subordinated to the Tedesco note and mortgage. The debt subordination agreement (exhibit 4) was signed by Agolli, on behalf of Fikri, and Antonios and provided to Tedesco's counsel prior to the closing of the refinance. At this juncture, Antonios left Attorney Sullivan's office.

Thereafter, Agolli, individually and on behalf of Fikri, executed the documents necessary to effectuate the settlement with Tedesco and the refinance of the debt. These include the Promissory Note (exhibit 1) at issue in this foreclosure and the Open End Mortgage Deed, Security Agreement and Fixture Filing (exhibit 2), which secured the Note. She understood that Fikri would remain indebted to Tedesco under the terms of the new Note and refinance. She understood that she was, at that time, the sole member of Fikri and that

she was binding Fikri under the terms of the agreement.

As agreed, Tedesco filed a withdrawal of the foreclosure action on July 27, 2011,[10] indicating thereon that the dispute had been "resolved by discussion of the parties on their own." During this time, though it is not clear precisely when, Angelo Tedesco was diagnosed with cancer. Prior to his passing, Scott Tedesco, his son, became the Trustee of the ATMPPP. The note and mortgage were thereafter transferred to the current plaintiff, the Heritage Builders of Waterbury, LLC, for which Scott Tedesco is also the Trustee. The plaintiff remains in possession of the Note, signed by Agolli on behalf of Fikri.

The first payment under the Note was due February 1, 2012. Fikri failed to make that payment and each payment due thereafter. The Note is in default.

## DISCUSSION

"In order to establish a prima facie case in a mortgage foreclosure action, the plaintiff must prove by a preponderance of the evidence that it is the owner of the note and mortgage, that the defendant mortgagor has defaulted on the note and that any conditions precedent to foreclosure, as established by the note and mortgage, have been satisfied." (Internal quotation marks omitted.) *Wells Fargo Bank, N.A.* v. *Strong,* 149 Conn. App. 384, 392, 89 A.3d 392, cert. denied, 312 Conn. 923, 94 A.3d 1202 (2014).

Here, based upon the facts found above, the plaintiff has established its prima facie case. The plaintiff is the current holder of the Note and Mortgage Deed securing the Note and the Note is in default. The defendants do not dispute these findings and there are no conditions precedent to foreclosure which have been identified as unmet.

The defendants rely instead upon several special defenses: no meeting of the minds; duress and lack of consideration. Each will be discussed in turn.

"A valid special defense at law to a foreclosure proceeding must be legally sufficient and address the making, validity or enforcement of the mortgage, the note or both. . . . Where the plaintiff's conduct is inequitable, a court may withhold foreclosure on equitable considerations and principles. . . . [I]f the mortgagor is prevented by accident, mistake or fraud, from fulfilling a condition of the mortgage, foreclosure cannot be had . . . ." (Internal quotation marks omitted.) *Fidelity Bank* v. *Krenisky,* 72 Conn. App. 700, 705–706, 807 A.2d 968, cert. denied, 262 Conn. 915, 811 A.2d 1291 (2002). The principle that a special defense must relate to the making, validity or enforcement of the note or mortgage "was . . . considered to include events leading up to the execution of the loan documents . . . ." (Internal quotation marks omitted.) *TD Bank, N.A.* v. *M.J. Holdings, LLC,* 143 Conn. App. 322, 328, 71 A.3d 541 (2013).

The defendants bear the burden of proving their special defenses. See *Emigrant Mortgage Co.* v. *D'Agostino*, 94 Conn. App. 793, 802, 896 A.2d 814, cert. denied, 278 Conn. 919, 901 A.2d 43 (2006). Although the defendants may rely upon more than one special defense, they need only establish one in order to defeat a finding of liability. See *Union Trust Co.* v. *Jackson*, 42 Conn. App. 413, 417, 679 A.2d 421 (1996).

A

Lack of Consideration

"To be enforceable, a contract must be supported by valuable consideration. . . . The doctrine of consideration is fundamental in the law of contracts, the general rule being that in the absence of consideration an executory promise is unenforceable." (Citation omitted; internal quotation marks omitted.) *Connecticut National Bank* v. *Voog*, 233 Conn. 352, 366, 659 A.2d 172 (1995). "[C]onsideration is [t]hat which is bargained-for by the promisor and given in exchange for the promise by the promisee . . . . [T]he doctrine of consideration does not require or imply an equal exchange between the contracting parties. . . . Consideration consists of a benefit to the party promising, or a loss or detriment to the party to whom the promise is made." (Internal quotation marks omitted.) *Thoma* v. *Oxford Performance Materials, Inc.*, 153 Conn. App. 50, 56, 100 A.3d 917 (2014). "Consideration . . . requires intent by the parties to incur benefits or detriments at the time an agreement is entered into." Id., 57. "Whether an agreement is supported by consideration is a factual inquiry reserved for the trier of fact . . . ." (Internal quotation marks omitted.) *Viera* v. *Cohen*, 283 Conn. 412, 442, 927 A.2d 843 (2007).

The court concludes that the Note and Mortgage Deed were supported by consideration and are therefore enforceable.

First, both the Note and the Mortgage Deed contain an acknowledgement by the defendants that both are signed upon receipt of consideration. The Note states that it is given "FOR VALUE RECEIVED." The Mortgage Deed provides: "KNOW YE, that Fikri Development, LLC . . . (the 'Mortgagor') for the consideration of One Dollar ($1.00) and other valuable consideration received to the Mortgagor's full satisfaction . . . does hereby give, grant . . . ." Declarations such as these are generally sufficient to satisfy the consideration requirements of a binding contract. See *Milford Bank* v. *Phoenix Contracting Group, Inc.*, 143 Conn. App. 519, 529–30, 72 A.3d 55 (2013).

Even absent these declarations, the evidence established that the defendants, in fact, received good and valuable consideration for the Note and Mortgage Deed. First and foremost, Angelo Tedesco withdrew the pending foreclosure action for which no defense had been

asserted and which was poised to go to judgment. Furthermore, the debt was restructured at a lower interest rate; the Note allowed for a six month grace period during which no payments would be due; and the mortgage deed no longer extended to Agolli's personal residence, removing any risk that she would lose her home in the event of a future default. The defendants' arguments to the contrary are not persuasive.[11]

B

Duress

"The classical or common law definition of duress is any wrongful act of one person that compels a manifestation of apparent assent by another to a transaction without his volition. . . . The defendant must prove: [1] a wrongful act or threat [2] that left the victim no reasonable alternative, and [3] to which the victim in fact acceded, and that [4] the resulting transaction was unfair to the victim. . . . The wrongful conduct at issue could take virtually any form, but must induce a fearful state of mind in the other party, which makes it impossible for [the party] to exercise his own free will." (Citation omitted; internal quotation marks omitted.). *Chase Manhattan Mortgage Corp.* v. *Machado*, 83 Conn. App. 183, 189–90, 850 A.2d 260 (2004).

The defendants presented no evidence to support this special defense. The defendants do not identify any wrongful act or threat by Tedesco. Agolli did not testify that she felt any fear or threat at the closing as a result of any conduct by Tedesco or otherwise. Agolli did not testify that her free will was overborne. The resulting transaction, as noted above, was not unfair to Fikri or Agolli and indeed provided an opportunity for Fikri to right its ship and for Agolli to keep her home from foreclosure.

Agolli testified that she did not like the deal. Nik Agolli testified that in his opinion, his mother "had no choice." The testimony derives from the viewpoint that Antonios had defrauded Agolli and Fikri leaving her "with no choice" but to proceed with the refinance.[12] This is insufficient. See *Chase Manhattan Mortgage Corp.* v. *Machado*, supra, 83 Conn. App. 190 ("[w]e will not invalidate a mortgage agreement against the mortgagee unless it participated in the alleged duress or had reason to know of its existence"). The question is whether Tedesco's conduct placed Agolli under duress. It did not.[13] See *Noble* v. *White*, 66 Conn. App. 54, 59, 783 A.2d 1145 (2001) ("[w]here a party insists on a contractual provision or a payment that he honestly believes he is entitled to receive, unless that belief is without any reasonable basis, his conduct is not wrongful and does not constitute duress or coercion under Connecticut law"). Further, even if Agolli consented to the transaction under protest, which does not appear to be the case, this does not establish duress. See id.,

citing *Smedley Co.* v. *Lansing*, 35 Conn. Supp. 578, 579, 398 A.2d 1208 (1978); see also *Twachtman* v. *Hastings*, Superior Court, judicial district of Tolland, Docket No. CV-95-57307-S (July 23, 1997) (*Hon. Harry T. Hammer*, judge trial referee) (20 Conn. L. Rptr. 145), aff'd, 52 Conn. App. 661, 727 A.2d 791 (consent secured by the pressure of financial circumstance is not sufficient to establish duress), cert. denied, 249 Conn. 930, 733 A.2d 851 (1999).

The defendants failed to prove the special defense of duress.

## C

## No Meeting of the Minds

Last, the defendants claim that there was no meeting of the minds as between Agolli and Tedesco with respect to the Note and Mortgage Deed. The argument is twofold. The defendants claim that Agolli could not legally bind Fikri at the time she executed the Note and Mortgage Deed purporting to do so. The defendants also claim that she did not have an adequate understanding of the transaction.

"In order for an enforceable contract to exist, the court must find that the parties' minds had truly met. . . . If there has been a misunderstanding between the parties, or a misapprehension by one or both so that their minds have never met, no contract has been entered into by them and the court will not make for them a contract which they themselves did not make." (Internal quotation marks omitted.) *Milford Bank* v. *Phoenix Contracting Group., Inc.*, supra, 143 Conn. App. 527–28. " 'Meeting of the minds' is defined as 'mutual agreement and assent of two parties to contract to substance and terms. It is an agreement reached by the parties to a contract and expressed therein, or as the equivalent of mutual assent or mutual obligation.' Black's Law Dictionary (6th Ed. 1990). This definition refers to fundamental misunderstandings between the parties as to what are the essential elements or subjects of the contract. It refers to the terms of the contract, not to the power of one party to execute a contract as the agent of another." *Sicaras* v. *Hartford*, 44 Conn. App. 771, 784, 692 A.2d 1240, cert. denied, 241 Conn. 916, 696 A.2d 340 (1997).[14]

When an agreement is reduced to writing and signed by all parties, the agreement itself is substantial evidence that a meeting of the minds has occurred. See *Tsionis* v. *Martens*, 116 Conn. App. 568, 577–78, 976 A.2d 53 (2009) ("[i]n light of the fact that a contract existed in written form that was signed by both parties, the plaintiffs' argument that a meeting of the minds did not occur is contrary to the evidence provided to the court"); see also *Reid* v. *Landsberger*, 123 Conn. App. 260, 268, 1 A.3d 1149 ("[b]ecause the agreement existed in written form and was signed by all parties, [the defen-

dant's] argument that a meeting of the minds did not occur is not supported by the evidence, at least where there is no mutual mistake as to the fundamental promises"), cert. denied, 298 Conn. 933, 10 A.3d 517 (2010).

Nonetheless, the defendants argue that Agolli was inadequately advised as to the terms of the settlement and refinance by Attorney Sullivan; that Attorney Sullivan did not explain the content of the documents; that her lack of proficiency in reading and writing English prevented her from understanding the documents she signed. As noted previously, the court credited Attorney Sullivan's testimony that he not only negotiated the terms of the settlement and refinance with input from, and at the direction of, Agolli as well as her children, but also that he explained the closing documents to Agolli. Perhaps Agolli had hoped for a different outcome but she was represented by counsel, she was involved in the negotiation; counsel explained the documentation to her and she understood and agreed to the terms of the refinance. The special defense on this basis is therefore not proven.

The defendants next argue that Agolli did not have the authority to bind Fikri. At the summary judgment phase of this litigation, the defendants relied upon the inconsistencies in the dates which appeared in the various closing documents to raise a genuine issue of material fact as to whether Joe and Gina Antonios were removed from Fikri prior to Agolli's signing of the Note and Mortgage Deed in which she purports to act on behalf of Fikri as its sole member. As a factual matter, that argument was laid to rest by, *inter alia*, Agolli's testimony:

"Q. [By Attorney Donnelly]: Now, I want to bring you back, again, to that July 26th, 2011 closing. Do you understand?

"A. Yes.

"Q. Okay, Now your home was removed; we've been over that, correct?

"A. Yes.

"Q. In addition, the interest rate was lowered from 10 percent to 5 percent on the loan, correct?

"A. Yes. Uh-huh.

"Q. And you're aware that. Also, on that date, you were able to remove Mr. Antonios and Mrs. Antonios from being involved in Fikri Development, correct?

"A. Yes.

"Q. All right. So, the removed—they were removed on that day.

"A. Yes.

"Q. And after—and you signed those loan documents representing Fikri Development, correct?

"A. Yes. . . .

"Q. Well, I will rephrase. So, you just stated that Mr. and Mrs. Antonios were removed from the company, true?

"A. Yes.

"Q. Okay, so you were the only remaining member at the time you signed the documents that you signed on July 26th.

"A. Yes.

"Q. Okay, so, by doing so you represented to my client that you had the ability to sign for Fikri Development, correct?

"A. Yes." (May 12, 2016 transcript, pp. 18–19.)

Agolli's testimony is entirely consistent with the testimony of Antonios, Attorney Sullivan and Suzi Zenko[15] as well as the executed closing documents.

Faced with this testimony, the defendants argue that Attorney Sullivan, Joseph Antonios and Gina Antonios failed to comply with the procedures in the Connecticut Limited Liability Company Act, General Statutes § 34-100 et seq. (the Act), or the Operating Agreement in effectuating Antonios' removal as manager and Gina Antonios as a member. Thus, they argue, Agolli could not legally bind Fikri.[16]

This argument is largely premised on "facts" which are not supported by the body of evidence. The defendants assert that "[n]one of the formalities necessary for Fikri to validly execute documents were ever followed." Attorney Sullivan was not questioned about such "formalities," the requirements of the Act, or even what he did or did not do to effectuate the removal of Joe and Gina Antonios. The defendants assert further that "Mrs. Antonios never provided written notice to Fikri," as required under the Act. Mrs. Antonios was asked whether she gave written notice. She replied that she did not recall. This is not evidence from which the court can infer that no written notice was given. The defendants aver that "Mrs. Agolli and Mrs. Antonios never voted to remove Mr. Antonios as manager." The court recalls neither testimony nor documentary evidence to support this assertion. Ironically, the defendants aver that "there is no evidence Mrs. Agolli ever even spoke with Mrs. Antonios about removal of Mr. Antonios." It is likely there was no evidence because this issue was not adequately raised prior to trial. However, the lack of evidence as to whether the procedural mechanisms necessary to removal were complied with inures to the defendants' detriment. The defendants bear the burden of proof with respect to their special defense. See *Emigrant Mortgage Co.* v. *D'Agostino*, supra, 94 Conn. App. 802.

In any event, and most importantly, the evidence is

both overwhelming and consistent that the removal of Joseph and Gina Antonios occurred prior to the closing on the refinance.

For all of the foregoing reasons, the defendants failed to prove the special defense of no meeting of the minds.

Judgment will enter in favor of the Plaintiff as to liability.

* Affirmed. *Tedesco* v. *Agolli*, 182 Conn. App. 291,    A.3d    (2018).

[1] The court does not attempt to include in this decision all of the evidence relied upon in the court's factual findings. The court has considered all of the evidence admitted. The reference to any subset of the evidence presented should not be construed as identifying the exclusive basis for the court's finding, and the court's failure to identify or mention specific evidence should not give rise to an inference that such evidence has not been considered.

[2] Nik Agolli testified that Antonios approached he and his mother, while Antonios testified that the Agollis approached him. The court need not determine which account is accurate in this litigation.

[3] Gina Antonios did not personally invest in Fikri and was largely uninvolved or passive with respect to Fikri's activities. The purpose of Gina's involvement in, and the structure of Fikri, remains unclear.

[4] Antonios' conduct, as manager of Fikri, is the subject of a civil action captioned *Fikri Development, LLC, et al.* v. *The Private Mortgage Fund, LLC, et al.*, which is pending on this court's docket at CV-12-6013458. Therein, Fikri alleges that Antonios defrauded Fikri, borrowing against the property only to divert the funds to his own personal use. This trial does not require a determination as to where the money went or to what purposes it was put by Antonios. Although Fikri asserted Antonios' fraudulent conduct as a defense in this foreclosure, the court previously determined that there was no genuine issue of material fact that Tedesco was not a knowing participant in any such chicanery. Therefore, Antonios' purported fraud against Fikri and Agolli cannot be visited upon the plaintiff by way of special defense to this foreclosure. See *Chase Manhattan Mortgage Corp.* v. *Machado*, 83 Conn. App. 183, 850 A.2d 260 (2004) (fraud by a third party upon a mortgagor does not invalidate a mortgage as against the mortgagee unless the mortgagee in some way participated in or knew of the fraud).

[5] The foreclosure action was filed in Waterbury Superior Court and was captioned *Angelo Tedesco, Trustee* v. *Resjimi Agolli et al.*, Docket No. CV-10-6006609. This court is permitted to and does therefore take judicial notice of the file in that matter. See *Jewett* v. *Jewett*, 265 Conn. 669, 678 n.7, 830 A.2d 193 (2003); *Wasson* v. *Wasson*, 91 Conn. App. 149, 157, 881 A.2d 356, cert. denied, 276 Conn. 932, 890 A.2d 574 (2005).

[6] Notwithstanding this testimony, the defendants maintain in their posttrial submission that this court should, as a factual finding, conclude that Antonios, in collusion with Tedesco, was the person responsible for the negotiated terms of the settlement and refinance. This is but one example of the defendants' proposed findings of fact having little or no support in the evidence presented.

[7] The defendants argue that the testimony of both Attorney Sullivan and Attorney Margolis was not credible. They snidely suggest the testimony suffered from "convenient" lapses of memory and/or was self-serving to conceal their own exposure for what the defendants suggest was legal malpractice on their part. The defendants, however, presented no credible evidence to rebut the testimony of Attorneys Sullivan and Margolis and indeed, the court found their testimony forthright and believable.

[8] The events in question occurred almost five years ago and none of the witnesses questioned were completely confident in their recollection as to who was present at what time during the course of the day on July 26, 2011.

[9] Two of the mortgages paid off on the Austen Road property were paid to Antonios related entities. Those mortgages total approximately $233,000. The validity of those mortgages and Antonios' entitlement to those funds will be determined in the fraud case brought by Fikri against Antonios.

[10] It is worth noting that the defendants had been defaulted for failure to disclose a defense and the plaintiff had filed a motion for judgment by strict foreclosure, which, if granted, would have resulted in Agolli losing her home.

[11] For the first time, in their posttrial brief, the defendants assert that Tedesco released Fikri from all debt, as evidenced by exhibit E, a release of the 2010 Tedesco mortgage dated July 14, 2011, which was prepared in connection with the July 26, 2011 closing. The defendants never asserted

any purported release as a special defense. It will not be further addressed.

[12] Indeed, the defendants argue that it was Antonios who "eliminated Mrs. Agolli's free will."

[13] The defendants claim that "Mr. Antonios and Mr. Tedesco created a trap for Mrs. Agolli with only one result possible for Mrs. Agolli and Fikri: loss of her land" is without support in the evidence. This court has previously determined that there was no genuine issue of material fact that Tedesco was neither involved in nor aware of any treachery on the part of Antonios. The evidence at trial did not alter this conclusion. Indeed, if Tedesco's nefarious goal was to ultimately take Agolli's land, he would simply have done so by way of the first foreclosure.

[14] The court had previously questioned whether the defendants' special defense of no meeting of the minds, as pleaded by the defendants, included the argument that Agolli could not bind Fikri. As a factual matter, it was first raised in the defendants' opposition to the plaintiff's motion for summary judgment. As noted at that time, this allegation does not appear in the defendants' special defenses. However, insofar as the issue was briefed without objection on this basis by the plaintiff, the court addressed the issue in the motion for summary judgment. Indeed, it was this argument as to which the court found a genuine issue of material fact and on which the court heard evidence at trial.

[15] Suzi Zenko testified as follows:

"Q. With respect to the July 26, 2011 closing, what was the result of that closing: in essence, what did that closing accomplish?

"A. We got rid of Joe.

"Q. Okay. How did you get rid of Joe?

"A. I mean, it was—he was removed. He withdrew from the LLC. Him and Gina were out."

[16] The broadest possible reading of the defendants' special defenses does not include such a claim, nor is this claim arguably within the scope of the issues addressed in the summary judgment motion. "Pleadings are intended to limit the issues to be decided at the trial of a case and [are] calculated to prevent surprise. . . . [The] purpose of pleadings is to frame, present, define, and narrow the issues, and to form the foundation of, and to limit, the proof to be submitted on the trial . . . . It is axiomatic that the parties are bound by their pleadings." (Internal quotation marks omitted.) *Brye* v. *State*, 147 Conn. App. 173, 177, 81 A.3d 1198 (2013). Notwithstanding, the court addresses the argument.

---